IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CHARLENE GILMORE,
      Plaintiff,

vs.                                  Case No. 3:09cv14/RV/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq.* It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.      PROCEDURAL HISTORY

Plaintiff filed an application for DIB on May 6, 2003, alleging disability as of November 19, 2002 (Tr. 62–64, 392).[1] Her application was denied initially and on reconsideration (Tr. 34–35). On November 21, 2005, following a hearing, an administrative law judge ("ALJ") found Plaintiff

---

[1] All references to "Tr." refer to the transcript of Social Security Administration record filed on May 18, 2009 (*see* Docs. 11, 12).

"not disabled" through November 21, 2005, the date of the ALJ's decision (Tr. 392–401). On March 23, 2007, the Appeals Council vacated the ALJ's decision and remanded Plaintiff's case for further proceedings (Tr. 425–28). On February 8, 2008, following another hearing, the ALJ again found Plaintiff "not disabled" at any time from November 19, 2002, through February 8, 2008, the date of the ALJ's second decision (Tr. 622–28). On December 5, 2008, the Appeals Council denied Plaintiff's request for review (Tr. 8–10). Thus, the decision of the ALJ dated February 8, 2008, stands as the final decision of the Commissioner, now subject to review in this court. Ingram v. Comm'r. of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007); Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998). This appeal followed.

## II.    FINDINGS OF THE ALJ

In a decision dated February 8, 2008, in which Plaintiff was found "not disabled," the ALJ made several findings relative to the issues raised in this appeal (*see* Tr. 622–28):

1)    Plaintiff meets the insured status requirements of the Act through June 30, 2005.

2)    Plaintiff has not engaged in substantial gainful activity since November 19, 2002, the date she alleges she became disabled.[2]

3)    Plaintiff has the following severe impairments: Crohn's disease, ischemia colitis, osteoporosis, and chronic obstructive pulmonary disease ("COPD").

4)    Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5)    Plaintiff has the residual functional capacity ("RFC") to perform work at a light level of exertion, including the ability to lift or carry up to twenty pounds, frequently lift or carry up to ten pounds, stand or walk up to six hours, push or pull arm or leg controls, grasp using her arms and hands, hold or turn objects, and occasionally stoop; she is limited in her ability to work at heights and in or around moving machinery, chemicals, humidity, temperature extremes, fumes or vibrations.

---

[2] Thus, the time frame relevant to this appeal is November 19, 2002 (alleged onset) to June 30, 2005 (date last insured).

6)      Plaintiff is able to perform her past relevant work (as that work is actually and generally performed) as a cashier at a golf course and as a retail manager; this work does not require the performance of work-related activities precluded by her RFC.

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment

must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2. If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3. If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5. Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL AND MEDICAL HISTORY[3]

A.    Personal History

Plaintiff was born on December 18, 1954, making her forty-seven years old on the date she alleges she became disabled (Tr. 614).  She has a high school education, is married, and lives with her husband and twenty-five year old son (Tr. 584, 612).  Plaintiff has not worked since December 2001 (Tr. 563).  She describes her medical condition as involving intestinal problems, rectal bleeding, bladder problems, allergies, COPD, and osteoporosis, among others, with—as discussed *infra*—resulting symptoms including severe pain, cramping, nausea, muscle spasms, urine leakage, and fatigue (*see* Tr. 565–69, 574).  She is a long term and heavy smoker (e.g., in August 2004 Plaintiff testified that she has smoked at least a pack and half of cigarettes per day for the past thirty-two years (Tr. 583)).  Plaintiff stated that her worst problem is with her stomach.

Plaintiff testified the Crohn's disease results in pain and daily cramps and nausea, and she has to stay in the bathroom for three or four hours a day, five days a week.  She further stated that she experiences pain in her right side and occasional muscle spasms.  Medications and heating pads help in improving Plaintiff's symptoms, but stress aggravates them, as does discontinuing her medications.  She further stated that her medications make her sleepy and drowsy and affect her attention and concentration.  She reported problems sleeping because of her muscle spasms, noting that she sleeps about four hours each night.  Plaintiff testified that she has constant back pain that is aggravated by lifting, pulling, bending, and stooping.  Medication helps by relieving pressure but does not eliminate the pain.  Plaintiff also testified that she has breathing problems for which she uses an inhaler every day and uses a breathing machine three to four times a day.  Her breathing problems are exacerbated by heat, humidity, smoking, and dust.  She further stated that when she is active around her house for fifteen to twenty minutes she has problems breathing.  She also experiences bladder leakage for which she takes medication and which causes accidents three or four times a day, but sometimes less.  She stated that her most recent incident with her bladder was the morning of her hearing and that she wears pads, which are adequate.  Plaintiff testified that she can sit or for stand twenty to twenty-five minutes and can walk a half a block on a "good day," noting

---

[3] Unless otherwise noted, the information in this section is derived from the opinion of ALJ.

that she has only two good days a week and that the rest are "bad days." She described a "good day" as a day she is not in the bathroom half the day, her pain medications are working, and she can do things around her house a little bit. She defined a "bad day" as a day when she is in the bathroom half the day, does not eat, and feels bad. Plaintiff additionally testified that she lies down once every day and otherwise lies and sits on the sofa in thirty-minute intervals. She can lift eight to ten pounds but cannot lift overhead. Lastly, Plaintiff testified that she cannot do a job that requires her to sit all day because sitting all day hurts her back.

B.  Medical History

1.  Robert M. Flurry, M.D.

Records in Plaintiff's file reflect that she was treated by Dr. Flurry, a family physician (*see* Tr. 338), from February 2, 2000, through August 23, 2007. The treatment records are extensive and, as summarized by the ALJ in his earlier decision, show diagnoses and treatment of epigastric pain, diverticulosis, sinusitis, Eustachian tube dysfunction, back spasm, back pain, COPD, kyphoscoliosis, rectal bleeding, nausea, right-sided abdominal pain with cholelithiasis, ischemic colitis, acalculus cholecystitis, urinary urge incontinence, osteoporosis, irritable bowel syndrome, depression, possible Crohn's disease, and hyperplastic colon polyps (Tr. 396 (referencing Tr. 261–308, 343–53, 375–84 (Dr. Flurry's treatment records from February 2, 2000, through June 6, 2005))). Moreover, the treatment notes show that on January 6, 2003, January 8, 2003, and November 10, 2003, Plaintiff's abdominal pain and COPD were improved with antibiotics, Cipro, and nebulizer therapy (Tr. 266, 270A).

Also in the first decision, the ALJ summarized Dr. Flurry's testimony, as provided at his deposition taken by Plaintiff's attorney on March 24, 2004 (*see* Tr. 397–98 (opinion of the ALJ referencing Tr. 315–37 (transcript of Dr. Flurry's testimony)); *see also* Tr. 410–11 (summary by Plaintiff's attorney of Dr. Flurry's testimony)). In relevant part, Dr. Flurry testified that he had treated Plaintiff since February 2000 and that Plaintiff's biggest problem is inflammatory bowel disease, most likely Crohn's disease, with persistent complaints of bloody stools and severe pain over the last two years (that is, from approximately March 2002 through March 2004). He further testified that Plaintiff suffers from emphysema and chronic back problems related to scoliosis and

osteoporosis, as well as depression and anxiety secondary to her physical impairments. He stated that she also suffers from COPD and stress urge incontinence, that she has a hard time making it through the day, and that she is on medications that sometimes exacerbate her fatigue. Dr. Flurry noted that biopsy reports from colonoscopies assess Plaintiff with Grade II colitis involving the transverse colon, which appears to be Crohn's disease, bacterial colitis, and/or ischemic bowel. He testified that an angiogram of the bowel showed an area of ischemic bowel but noted that Dr. Cartee[4] felt she did not have ischemic bowel, and a bone density scan showed osteoporosis of the spine. He testified that Plaintiff's main debilitating symptom of colitis is pain, for which she takes narcotic pain medicine. He stated that Plaintiff also frequently experiences loose stools, bloody diarrhea, and mucous stools. He testified that Plaintiff is significantly overweight and has significant scoliosis, low back pain, low back spasms and kyphoscoliosis, which is an abnormal curvature of the spine, and that any significant lifting, bending, or pulling by Plaintiff would cause significant pain. He also testified that Plaintiff's pain makes it hard for her to be in social settings or work settings if her pain is such that she has to take narcotics. He stated that Plaintiff's pain has caused some depression issues and that Plaintiff has problems interacting with physicians. Dr. Flurry additionally stated that Plaintiff suffers from shortness of breath as a result of COPD and from urine leakage as a result of urge incontinence, for which she must wear protection. Dr. Flurry testified that Plaintiff has degenerative changes in her back, and her abdomen is tender. She has ongoing or chronic fatigue and low back pain, and she would need unscheduled breaks during an eight-hour workday. Dr. Flurry was unsure whether Plaintiff could work at all during a flare-up of her abdominal pain, but otherwise he felt she could work a couple of hours at a time before a break. He testified that her back pain would not prevent her from working, but her abdominal pain would not permit work. *Id.*

Dr. Flurry opined that Plaintiff could walk a city bock without rest, sit continuously for thirty to forty-five minutes (for a total of four to six hours in an eight-hour workday), and stand thirty to forty-five minutes (for less than a total of two hours in an eight-hour workday). He further opined that if Plaintiff was working in a job that required sitting for long periods she would need to walk for five to ten minutes, every forty-five minutes, and she would need a job that permitted shifting

---

[4] As discussed *infra*, Dr. Flurry referred Plaintiff to Wayne David Cartee, M.D., a gastroenterologist.

positions at will. He also opined that Plaintiff could frequently and occasionally lift or carry less than ten pounds. *Id.*

In response to "multiple choice" questions regarding pain and medication side effects, Dr. Flurry testified that Plaintiff's pain is irretractable and virtually incapacitating (*see, e.g.*, Tr. 331). He further indicated that Plaintiff's pain is greatly increased by physical activity and to such a degree as to cause distraction or total abandonment of tasks. He noted that the side effects of Plaintiff's prescribed medications are sometimes severe and limit effectiveness due to distraction, inattention and drowsiness, and they are sometimes totally restricting, causing Plaintiff to be unable to function at a productive level of work. Dr. Flurry testified that Plaintiff is extremely limited in her ability to deal with work-related stress, and she frequently experiences symptoms severe enough to interfere with attention and concentration. He stated that he would expect Plaintiff's impairments or treatment to cause her to be absent from work more than three times a month. He also noted that Plaintiff has a home nebulizer, which delivers medications for Plaintiff's breathing impairment. Finally, Dr. Flurry opined that Plaintiff's impairments have lasted or can be expected to last for at least twelve months, and that her prognosis is fair. *Id.*

Following Dr. Flurry's deposition, Plaintiff continued her treatment. At an office visit on March 29, 2004, Dr. Flurry noted that Plaintiff had been referred to Dr. Powell for another opinion regarding Plaintiff's abdominal complaints, but the appointment with Dr. Powell "was not very rewarding"(Tr. 347).[5] Although Plaintiff continued to complain of "somewhat debilitating" abdominal pain, she advised Dr. Flurry that she did not want to undergo any further testing or try any new medications (*id.*). In August 2004, Plaintiff noted that medication helped her breathing and pain-related nausea (*see* Tr. 573–75). Dr. Flurry's reports from additional visits (or calls from Plaintiff) in July, November, and December of 2004, and June of 2005, are generally the same, reflecting Plaintiff's continued reports of abdominal pain or flare-ups of abdominal pain or both (Tr.

---

[5] The record reflects that Plaintiff saw Ronald S. Powell, M.D., a gastroenterologist, on March 12, 2004 (Tr. 310, 339). Although Plaintiff was informed by Dr. Powell that further diagnostic testing would be "very helpful," she refused to undergo recommended testing, such as a CT scan, believing "she had just been through everything" (Tr. 311). Plaintiff stated she was "unhappy about having to take the medication given to her" by Dr. Powell and that she does not like to take medication (Tr. 309). Plaintiff called Dr. Powell's office later in the day to report her dissatisfaction with her office visit (*id.*).

345, 343, 379, 378, 375). At a visit on December 10, 2004, Dr. Flurry noted that recently-completed lab work "was all normal" (Tr. 379).[6] Likewise, a CT scan of Plaintiff's abdomen, requested by Dr. Flurry and taken on December 22, 2005, revealed no acute process in the abdomen, although diffuse fatty changes in the liver were observed (Tr. 456, 461–62). In March 2006, Dr. Flurry noted that results of a colonoscopy performed on February 20, 2006, were "considered normal," and Plaintiff was assessed with chronic abdominal pain and questionable inflammatory bowel disease (Tr. 458; *see also* Tr. 469–70).[7]

As previously noted, following the first decision of the ALJ the Appeals Council remanded Plaintiff's case for further administrative proceedings. Thereafter, Dr. Flurry was deposed again by Plaintiff's counsel "to supplement his previous deposition testimony" (*see* Tr. 440). At his second deposition, taken July 23, 2007, Dr. Flurry opined in relevant part that Plaintiff is not capable of working and has not been capable of working since November 2002 (*see* Tr. 442–43, 494–522). He also testified that Plaintiff would continue to have the same complaints and that her lung condition would worsen. *Id.*[8]

Also following the remand order, additional treatment records from Dr. Flurry were incorporated into the record. These records demonstrate that Plaintiff continued to see Dr. Flurry and continued, generally, to make the same complaints. For example, Plaintiff presented on October 2, 2006, with reports of "the same abdominal pain" (Tr. 481). Dr. Flurry noted on that date that Plaintiff's "[w]orkup to date has been somewhat confusing and non-revealing," and—in relevant part—he assessed Plaintiff with chronic abdominal pain, osteoporosis, and urinary incontinence

---

[6] The undersigned notes that in addition to lab testing, Plaintiff underwent chest x-rays in March 2004 and February 2005, after complaining of coughing and shortness of breath (presumably related to her COPD). The earlier x-ray was generally unremarkable, revealing only an opacity that was believed to be a benign fat-pad, while the later x-ray revealed evidence of "probable lung disease" (Tr. 352, 383). Additionally, Dr. Flurry noted at Plaintiff's February 9, 2005, office visit that Plaintiff smelled strongly of cigarette smoke and was still smoking at least a pack and a half of cigarettes daily (Tr. 376).

[7] Specifically, the February 2006 colonoscopy revealed 1) hemorrhoids, otherwise normal colonoscopy to the cecum, 2) no evidence of residual colitis, and 3) "fixed pelvic loops apparently related to adhesions" (Tr. 470). Dr. Flurry commented that "no active colitis" was observed (Tr. 493).

[8] Plaintiff's attorney has provided a more detailed summary of Dr. Flurry's testimony (*see* Tr. 442–43), which need not be repeated here, as the parties do not dispute the substance of his testimony.

(*id.*).  Plaintiff returned to Dr. Flurry on April 10, 2007, and July 17, 2007, with similar complaints regarding abdominal pain and additional complaints of back pain and shortness of breath; she also reported that she continued to smoke (*see* Tr. 493, 552).  A chest x-ray taken July 18, 2007, revealed no abnormality, with a normal heart, clear lungs, and no change in lung volume from an x-ray taken February 9, 2005 (Tr. 551).  On August 16, 2007, it was noted that pulmonary function testing revealed mild obstructive lung disease and prolonged diffusion capacity, but "the degree of obstructive lung disease [was thought to] be 'underestimated'" (*see* Tr. 546).  Plaintiff was assessed with severe obstructive lung defect, consistent with COPD (Tr. 545).

        2.    <u>Emergency Room Admissions, Treatment by Other Physicians, and Miscellaneous Diagnostic Testing</u>

Plaintiff presented to the emergency room ("ER") at Sacred Heart Hospital on November 19, 2002 (the date she alleges she became disabled), experiencing sharp, right abdominal pain with rectal bleeding, diarrhea, nausea, and vomiting (Tr. 153–65, 190).  Plaintiff was discharged the same day with instructions to follow up with Dr. Wayne David Cartee, M.D., and to maintain a clear liquid diet until she was seen by him (Tr. 157).

Plaintiff saw Dr. Cartee, a gastroenterologist, on November 20, 2002, and he ordered various tests and "work-ups" (Tr. 190–91).  A colonoscopy revealed grade II colitis involving the transverse colon, but otherwise was "basically unremarkable," and stool cultures were negative (Tr. 188, 186).  Plaintiff was assessed with acute colitis, probably related to Crohn's disease, and hemorrhoids (Tr. 189).  A pelvic sonogram revealed an ovarian cyst with "no imaging characteristics of concern," and Plaintiff was advised to follow up in three months to ensure that the cyst had no underlying pathology (Tr. 152).  On January 20, 2003, Plaintiff saw Dr. Cartee and reported that she no longer had diarrhea or bloody or loose stools, although she continued to experience abdominal pain (Tr. 186, 184).  On February 5, 2003, Dr. Cartee noted that a "Prometheus IBD panel" had been completed and was negative for any markers for Crohn's disease or ulcerative colitis (Tr. 184).  He

also noted that Plaintiff's diarrhea and bloody stools had "resolved," and her abdominal pain had "significantly lessened in severity" (*id.*).[9]

Plaintiff returned to Dr. Cartee on May 6, 2003, and reported persistent abdominal pain for the past three months, with occasional rectal bleeding (Tr. 182). Plaintiff was assessed with ischemic colitis, diffuse abdominal pain, and intermittent rectal bleeding (*id.*). Another colonoscopy was performed in July 2003, as well as additional diagnostic studies, and when Plaintiff returned to Dr. Cartee on August 29, 2003, he reviewed the results with her (Tr. 178). In relevant part, Dr. Cartee noted that a barium enema, complete blood count, and small bowel series were unremarkable, and an abdominal ultrasound revealed probably fatty infiltration to the liver (*id.*). Plaintiff was assessed with hyperplastic colon polyps (removed during the colonoscopy), persistent right upper abdominal pain, and elevated liver-associated enzymes with fatty infiltration to the liver (*id.*).

Plaintiff presented to the Baptist Hospital ER on June 14, 2003, with complaints of abdominal pain (Tr. 523–30). Specifically, Plaintiff reported right upper quadrant pain that had increased that day, prompting her to present to the ER (Tr. 527). Plaintiff was released within a few hours (*see* Tr. 524, 527).

A treatment record from Dr. Cartee, dated October 14, 2003, states:

> [Plaintiff] has had a very extensive mark-up from [a] GI standpoint, probably abdominal pain and this has all been negative including negative CT scan, abdominal ultrasound, HIDA scan of biliary system, small bowel x-ray and barium enema. She continues to complain of pain occurring in the right upper quadrant and indicates at times she has some pain in left upper quadrant that she describes as feeling as though it is like a Charlie horse. This sometimes radiates to other areas of the abdomen. She has tried heating pad, hot water bottle and this does give her some temporary relief. It does not seem to be related to types of foods, timing of meals, etc. She had a mesenteric angiogram also completed in [January 2003] that showed a small area of hypoprofusion that was confirmed on colonoscopy, but this apparently resolved since the barium enema shows resolution. She does indicate she has a family member that has fibromyalgia.

---

[9] On January 17, 2003, Plaintiff presented to the ER at Baptist Hospital with complaints of right lower quadrant pain, but the records concerning this ER visit consist of only two pages and provide little relevant information (*see* Tr. 166–67). Moreover, there is no mention of the Baptist ER visit in Dr. Cartee's January 20 or February 5, 2003, office notes (*see* Tr. 186–87, 184).

(Tr. 177). Plaintiff was then assessed with fibromyalgia and fatty infiltration of the liver and referred to Dr. Luetkemeyer for further evaluation regarding issues related to fibromyalgia (*id.*).[10]

Plaintiff presented to the Baptist Hospital ER on October 28, 2003, with reports of rectal bleeding and was diagnosed with probable colitis (Tr. 217–30). X-rays of the abdomen were unremarkable (Tr. 223).

C.      Opinions of Examining and Non-Examining Consultative Physicians

Tom Peele, M.D., AAP, a non-examining agency physician, completed a Physical RFC Assessment on August 2, 2003 (Tr. 168–75). Dr. Peele opined that Plaintiff could occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds, and stand, walk, or sit six hours in an eight-hour workday (Tr. 169). He further opined that Plaintiff's ability to push or pull was unlimited, and she had no postural manipulative, visual, communicative, or environmental limitations (Tr. 169–72).

Richard W. Lucey, M.D., examined Plaintiff on December 1, 2003 (Tr. 231–33B). Plaintiff reported chronic recurrent abdominal pain, which she described as "intermittent spasms in her abdomen" (Tr. 231). Dr. Lucey reviewed Dr. Cartee's records and noted Plaintiff's extensive GI testing, all with negative results (*id.*). He also noted Plaintiff's chronic lung disease, related to Plaintiff's "2 pack a day" cigarette habit (Tr. 232). Plaintiff reported shortness of breath with any significant exertion (*id.*). Dr. Lucey observed that Plaintiff demonstrated a normal gait, posture, and heel, toe, and tandem walk (*id.*). Additionally, Dr. Lucey reported full range of movement of all major joints in Plaintiff's upper and lower extremities, a mild decrease in lateral rotation of Plaintiff's neck, and a mild decrease in range of movement of the thoracolumbar spine (*id.*). Dr. Lucey stated that pulmonary function studies would be helpful in assessing the severity of Plaintiff's COPD (Tr. 233).

---

[10] The file contains no treatment records from Dr. Cartee for more than two years following this visit. When Plaintiff returned on February 8, 2006, she was assessed with chronic abdominal pain of unclear etiology and alternating bowel habits (that is, alternating between constipation and diarrhea), and Dr. Cartee recommended another colonoscopy (Tr. 456–57). Dr. Cartee performed the colonoscopy on February 20, 2006, and Plaintiff was advised to follow up in two to three weeks (*see* Tr. 468–70).

J. Patrick Neal, M.D., another non-examining agency physician, completed a Physical RFC Assessment on December 12, 2003 (Tr. 239–46). Dr. Neal's opinions are identical to Dr. Peele's opinions with one exception; that is, Dr. Peele opined, with regard to environmental limitations, that Plaintiff should avoid concentrated exposure to wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, as well as temperature extremes and hazards such as machinery or heights (Tr. 240-43).

On March 14, 2005, Plaintiff underwent an orthopedic evaluation by C. W. Koulisis, M.D. (Tr. 354). Dr. Koulisis noted that although Plaintiff complained of low back pain, she "objectively" maintained her range of motion, had no palpable spasm, and was neurologically intact (Tr. 356). Dr. Koulisis conducted range of motion testing and noted that Plaintiff's only limitation is knee flexion of 0–130 degrees as opposed to 0–150 degrees (*see* Tr. 357–59). Dr. Koulisis also completed an assessment of Plaintiff's physical capacities, specifically noting that his opinions concerned only her orthopaedic condition, and finding that Plaintiff had no limitations (*see* Tr. 360–63).

On March 17, 2005, Plaintiff was examined by Sal A. Vernali, M.D., P.A, who practices in the areas of pulmonary and internal medicine, and who diagnosed Plaintiff with Crohn's disease and COPD (Tr. 364, 367). Plaintiff's physical examination was essentially normal, and Dr. Vernali found no limitations in Plaintiff's range of motion (*see* Tr. 366, 368–70). With regard to Plaintiff's physical capacities, Dr. Vernali opined that Plaintiff could occasionally lift up to twenty pounds and frequently carry up to ten pounds (Tr. 371). He further opined that Plaintiff could frequently reach, handle, feel, hear, speak climb, balance, use her feet, and use her hands for simple grasping and fine manipulation; she could occasionally stoop, crouch, kneel, crawl, push, and pull (Tr. 373). Dr. Vernali also offered opinions regarding the length of time Plaintiff could sit, stand, or walk (*see* Tr. 372), but those opinions are at issue in the instant appeal and will be discussed, *infra*. Lastly, Dr. Vernali opined that Plaintiff is restricted with regard to heights, moving machinery, chemicals, humidity, temperature extremes, fumes, and vibrations, but he did not indicate the level of Plaintiff's restriction (that is, whether she should avoid all exposure or only moderate or concentrated exposure) (*see* Tr. 374).

V.     DISCUSSION

Plaintiff raises five grounds for relief in the instant appeal, which—for organizational purposes—in addressing the undersigned has rearranged, and where appropriate, combined. Specifically, Plaintiff asserts the ALJ erred in 1) determining her RFC, 2) rejecting the opinions of Dr. Vernali (a consultative examiner) and Dr. Flurry (a treating physician), 3) failing to properly consider whether her COPD meets or equals a listed impairment, 4) rejecting her complaints of pain, and 5) failing to fully develop the record.

  A.  Whether Plaintiff's COPD Meets or Equals a Listed Impairment/Development of the Record

Plaintiff contends that an August 2007 pulmonary function study ("PFS") establishes that her COPD meets Listing 3.02A of the Commissioner's Listing of Impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1 (Doc. 19 at 14–15). Plaintiff further asserts that the ALJ erred in failing to specifically address the PFS, and she appears to contend that had the ALJ done so he would have found Plaintiff disabled at step three (*see id.*). In a related argument, Plaintiff contends that the ALJ should have sought additional medical evidence regarding when her COPD reached listing-level severity (*id.*).

At the third step of the sequential evaluation, the ALJ must determine whether the claimant has an impairment that meets or medically equals a listed impairment. If an impairment meets or equals one of the listed impairments, as well as the twelve-month duration requirement, it is presumptively disabling, and no further inquiry is required. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), (d). The burden at this step, though, is on the claimant. And to meet this burden a claimant must submit evidence proving that she meets or equals all of the specified criteria of the applicable listing and the duration requirement. *See* Bell v. Bowen, 796 F.2d 1350, 1353 (11th Cir. 1986) ("when a claimant contends that he has an impairment meeting the listed impairments entitling him to an adjudication of disability under regulation 404.1520(d), he must present specific medical findings that meet the various tests listed under the description of the applicable impairment"; alternatively, if a claimant "contends that he has an impairment which is equal to one of the listed impairments, the claimant must present medical evidence which describes how the impairment has such an equivalency"); Wilkinson v. Bowen, 847 F.2d 660, 662 (11th Cir. 1987) (same).

In considering the medical evidence here the ALJ noted that certain exhibits were added to Plaintiff's file following remand by the Appeals Council, including Exhibit 30F, which is the exhibit containing Plaintiff's August 2007 PFS (Tr. 626, 545–52). The ALJ then specifically stated that he had considered the new exhibits before rendering his decision (Tr. 626). The ALJ also pointed out that in reviewing the new exhibits he "was cognizant . . . that [Plaintiff's] date last insured was June 30, 2005, and that this new evidence, to be deemed material, needed to relate to the establishment of disability prior to [Plaintiff's] date last insured" (*id.*). It is therefore evident that the ALJ considered the August 2007 PFS but concluded that it did not relate to the relevant time frame.

Indeed, as previously noted, the time frame relevant to Plaintiff's claim for DIB is November 19, 2002, through June 30, 2005. A study performed more than two years beyond June 30, 2005, even if it establishes COPD at listing-level severity as Plaintiff contends, does not establish COPD at listing-level severity during the relevant time frame, as the ALJ found. Although evidence that postdates the relevant time frame should normally be considered, it should only be considered to the extent it relates to the severity of the claimant's condition prior to the date last insured, *see* Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984), and the evidence ought to be "reasonably proximate" to the relevant time frame. Begley v. Mathews, 544 F.2d 1345, 1354 (6th Cir. 1976). Here, the August 2007 PFS is not "reasonably proximate" to the relevant time frame, and it does not relate to the severity of Plaintiff's condition during the relevant time frame.

Likewise, the results of a September 2003 stress test, referenced by Plaintiff in support of this claim for relief (*see* Doc. 19 at 15 n.5), do not establish COPD at listing-level severity, as the test results were deemed "essentially normal" by the referring physician (*see* Tr. 268, 278–79), nor do mere complaints of shortness of breath by Plaintiff (*see* Doc. 19 at 15 n.5; Tr. 234).[11] Plaintiff has pointed to no other evidence in the record that establishes COPD at listing-level severity prior to the expiration of her insured status, and the court has found none. Plaintiff, therefore, has

---

[11] Plaintiff also referenced in support of this claim a "pulse oximeter" test purportedly performed by Dr. Flurry in 2003 (*see* Doc. 19 at 14–15 (referencing Tr. 506)). However, the test results are not a part of the record; rather, Plaintiff relies on Dr. Flurry's equivocal testimony about whether he actually conducted this test, and if so, the significance of various test results (*see id.*). Moreover, the thrust of Dr. Flurry's testimony is that certain test results substantiate the presence of COPD (*see* Tr. 506–07), an issue not in dispute here. His testimony does not establish COPD at listing-level severity in 2003, even if the test results are indeed Plaintiff's (*see id.*).

correspondingly failed to carry her burden of proof at step three, and the ALJ did not err in concluding that her COPD did not meet or equal a listed impairment during the relevant time frame. *See* <u>Demandre v. Califano</u>, 591 F.2d 1088, 1090 (5th Cir. 1979) ("If a claimant becomes disabled [a]fter he has lost insured status, his claim must be denied despite his disability") (citations omitted);[12] *see also* Social Security Ruling ("SSR") 74-8c, available at 1974 WL 11141, at *2 (S.S.A. 1974)  ("evidence of impairment which . . . reached disabling severity after expiration of claimant's insured status cannot be basis for finding of disability") (citations omitted).

To the extent Plaintiff contends the ALJ erred by failing to obtain a medical opinion as to when her COPD reached listing-level severity, Plaintiff's argument fails.  The burden is on Plaintiff, not the ALJ, to provide evidence that she met the criteria of a listed impairment during the relevant time frame.  Moreover, an ALJ has no obligation solicit evidence or further develop the record if he has sufficient information to decide the case.  <u>Graham v. Apfel</u>, 129 F.3d 1420, 1423 (11th Cir. 1997) (holding that where the record is complete and adequate to make a decision, no showing of prejudice is made).  Here, the record was complete as to Plaintiff's condition during the relevant time frame.  The results of testing reflecting her condition more than two years beyond the end of that time frame did not trigger a duty on the part of the ALJ to solicit a medical opinion—one that would necessarily be highly speculative—regarding whether Plaintiff's COPD was at listing-level severity prior to her date last insured, and if so, when it reached such severity and whether it met the duration requirement.  *See* <u>Wilson v. Apfel</u>, 179 F.3d 1276, 1278 (11th Cir. 1999) (holding that additional expert medical testimony was unnecessary where the record was sufficient for a decision). Accordingly, the ALJ did not err.

---

[12] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all former Fifth Circuit decisions rendered before October 1, 1981.

B.      Consideration of the Opinions of Dr. Vernali and Dr. Flurry/Development of the
        Record

Substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* Lewis, 125 F.3d at 1439–41; Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991);  Sabo v. Chater,  955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).   "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See* Edwards, 937 F.2d at 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).   Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See* Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986); Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).   When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion.  *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether a claimant meets a listed

impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors, because those ultimate determinations are the province of the Commissioner. 20 C.F.R. § 404.1527(e). The opinion by a treating physician that a patient is "unable to work" or is "disabled" is not dispositive for purposes of Social Security claims. The Commissioner's regulations and the interpretations of those regulations clearly provide that an ALJ should give weight to a physician's opinions concerning the nature and severity of a claimant's impairments, but that the ultimate question of whether there is disability or inability to work is reserved to the Commissioner. For instance, 20 C.F.R. § 404.1527(e)(1) specifically states that a finding of disability or inability to work by a medical source does not mean that the Commissioner will automatically reach the same conclusion. Furthermore, the Commissioner "will not give any special significance to the source" of an opinion on issues reserved for the Commissioner. 20 C.F.R. § 404.1527(e)(3); *see also* SSR 96-5p, available at 1996 WL 374183, at *1 (S.S.A. 1996) (whether an individual is disabled is a question reserved to the Commissioner; treating source opinions on such questions are "never entitled to controlling weight or special significance"). Although such opinions on disability are not entitled to controlling weight, they must not be ignored, and the Commissioner must examine the entire record to determine whether such opinions are supported by the record.

Finally, the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole. *See* Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Oldham v. Schweiker, 660 F.2d 1078, 1084 (Former 5th Cir. Unit B Nov. 1981).

1.      Dr. Vernali

As previously noted, Plaintiff was consultatively examined by Dr. Vernali in March 2005. Plaintiff's physical examination was essentially normal, and Dr. Vernali found no limitations in Plaintiff's range of motion (*see* Tr. 366, 368–70). Dr. Vernali then provided opinions regarding Plaintiff's physical abilities, including the following opinions relevant to the instant claim. Dr. Vernali opined that Plaintiff could 1) sit one to two hours at a time for a total of one hour in an eight-

hour workday, 2) stand one to two hours at a time for total of less than one hour in an eight-hour workday, and 3) walk more than one hour without interruption (Tr. 372). The ALJ acknowledged these opinions but declined to assign significant weight to them, noting that these opinions of Dr. Vernali are "internally inconsistent" (Tr. 626). The opinions are indeed inconsistent, as Dr. Vernali states that Plaintiff can <u>sit for only one hour</u> and <u>stand for less than one hour</u>, <u>total</u>, in an eight-hour workday, but he also states that she can <u>sit or stand up to two hours at one time</u> without interruption (*see* Tr. 372). Thus, the record supports the ALJ's finding, and the inconsistencies were properly considered by the ALJ in discounting Dr. Vernali's inconsistent opinions. *See, e.g.*, <u>Phillips</u>, 357 F.3d at 1240–41 (good cause exists for discounting physician's opinion where opinion was conclusory or inconsistent).[13] Accordingly, the ALJ did not err.

It is worth noting, though, that only the inconsistent opinions of Dr. Vernali were specifically rejected by the ALJ and that the remainder of his opinions are generally consistent with the ALJ's ultimate determination that Plaintiff could perform light work. Moreover, many of Dr. Vernali's opinions were specifically incorporated into Plaintiff's RFC by the ALJ.[14]

Plaintiff additionally contends, however, that the ALJ failed to follow the remand order of the Appeals Council with regard to Dr. Vernali (*see* Doc. 19 at 4, 12–13). Plaintiff notes that the remand order states, in relevant part, that the first decision of the ALJ failed to "adequately consider . . . all of the medical opinions," including the opinions of Dr. Vernali regarding Plaintiff's sitting and standing capacities, and it instructs that "further consideration [of those opinions is] necessary" (*id.*; Tr. 426). Plaintiff contends the ALJ did not "further consider" the "sit/stand" opinions as instructed (Doc. 19 at 12–13).

Having considered the record and the specific directives of the remand order, the court finds that the ALJ did not fail to comply with the terms of the remand order. In his first decision the ALJ

---

[13] Moreover, Dr. Vernali failed altogether to answer a question that asked how long Plaintiff could walk, total, in a workday; Dr. Vernali also opined that Plaintiff could walk "more than" one hour at a time without interruption but did not state the precise length of time she could walk without interruption, although the form includes options that are to be selected (ranging from one to eight hours at a time without interruption) (*see* Tr. 372).

[14] For example, Dr. Vernali and the ALJ both found that Plaintiff could occasionally lift up to twenty pounds, frequently carry up to ten pounds, frequently grasp, and she was restricted regarding working at heights, in humidity or temperature extremes, and around moving machinery, chemicals, fumes, and vibrations (*compare* Tr. 371–74 *with* 625).

summarized all of Dr. Vernali's findings and opinions (Tr. 398). The ALJ then determined that the opinions of Dr. Vernali, along with those of Dr. Koulisis, Neal, and Peele, established that Plaintiff was capable of performing work at the light level of exertion (Tr. 399). As the Appeals Council pointed out, however, Dr. Vernali's opinions as to Plaintiff's ability to sit and stand appear inconsistent with a finding that she could perform light work,[15] and the ALJ did not address the apparent inconsistency in the first decision; nor did he discredit any of Dr. Vernali's opinions (Tr. 426, 398–99). Thus, the ALJ was specifically directed to consider and address the "sit/stand" opinions of Dr. Vernali (notably, in its remand order the Appeals Council did not discuss, recognize, or otherwise acknowledge the inconsistencies in Dr. Vernali's opinions; rather, the Appeals Council simply directed the ALJ to consider the opinions) (*see* Tr. 426). Upon remand, the ALJ considered the opinions at issue, explained the weight he assigned to them, and provided his reasons for discrediting them. In doing so, the ALJ complied with the instructions of the Appeals Council.

　　To the extent Plaintiff contends the ALJ was required to recontact Dr. Vernali, either by the terms of the Appeals Council's order or otherwise, the undersigned cannot agree. First, as to the remand order, in addition to directing the ALJ to further consider certain opinions of Dr. Vernali, the order also stated that, "[a]s appropriate," the ALJ "may request . . . additional evidence and/or further clarification of the opinions and medical source statement about what the claimant could still do despite [her] impairments through June 30, 2005" (Tr. 427). Thus, the remand order did not mandate that the ALJ recontact any physician; rather, the ALJ was advised that he "may" do so (*see id.*). Moreover, the ALJ was not otherwise required to recontact Dr. Vernali. The record contains the opinions of four other physicians, all of whom rendered opinions consistent with the ALJ's RFC determination (and largely consistent with the opinions of Dr. Vernali). Moreover, only a very small

---

[15] Light work is defined in 20 C.F.R. § 404.1567(b) as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

portion of Dr. Vernali's opinions were rejected, and they were rejected on a well-founded basis (indeed, Plaintiff acknowledges that Dr. Vernali must have been "confused" in rendering those opinions (*see* Doc. 19 at 13)).  Although the ALJ could have recontacted Dr. Vernali, and even if recontacting him might have been helpful in understanding his "sit/stand" opinions, the ALJ did not have a duty to do so.  Wilson, 179 F.3d at 1278; Brown v. Shalala, 44 F.3d 931, 935 (11th Cir. 1995) (further development of the record necessary if the "record reveals evidentiary gaps which result in unfairness or clear prejudice") (citations omitted); Graham, 129 F.3d at 1423 ("[T]here must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded to the [Commissioner] for further development of the record.").  Thus, the ALJ did not err in failing to recontact Dr. Vernali, as no evidentiary gaps exist, and the ALJ had sufficient information to decide the case.

2.  Dr. Flurry

As previously noted, Dr. Flurry provided deposition testimony concerning Plaintiff's physical capacities, pain, medication side effects, and expected absenteeism if employed.  At Plaintiff's hearing before the ALJ, a vocational expert ("VE") was asked to consider Dr. Flurry's opinions, and whether—if the opinions were accepted as true—Plaintiff would be able to perform work.  In response, the VE opined that Plaintiff would be precluded from all work if the opinions were accepted (*see* Tr. 613–17).  The ALJ, however, rejected Dr. Flurry's opinions and consequently found Plaintiff capable of performing work.  Plaintiff contends the ALJ erred in this regard.

In rejecting Dr. Flurry's opinions, the ALJ found that his deposition testimony was "contradicted by, and simply not supported by his own office notes," and further, that his testimony was "inconsistent with the record as a whole" (Tr. 318, 627).  In support, the ALJ stated that "Dr. Flurry's treatment notes do not support his stated limitations as to [Plaintiff's] ability to function" because his treatment notes "fail to set forth the frequency as to [Plaintiff's] symptoms, the extent of her limitations or any specific limitations as to her ability to function" (Tr. 627).  Indeed, although Dr. Flurry testified regarding Plaintiff's limitations and restrictions, his treatment notes from the relevant time frame do not identify any such limitations; likewise, as the ALJ found, the treatment notes do not indicate the frequency of Plaintiff's symptoms (*see* Tr. 261–307, 343–53; 375–84) (reflecting treatment by Dr. Flurry during the time frame relevant to Plaintiff's claim)).  For

example, the treatment notes do not contain any mention by Plaintiff of a need to be in the bathroom half the day on most days or to lie down or rest throughout the day, and they do not reflect complaints of difficulty sleeping. Although Plaintiff reported abdominal pain and back pain with spasms or muscle cramping, Dr. Flurry noted that Plaintiff's back was normal to inspection and palpation, with no tenderness and full range of motion and only "minimal pain" (*id.*; Tr. 271). Thus, the ALJ's finding (that is, that Dr. Flurry's treatment notes do not support his deposition testimony regarding Plaintiff's limitations) is substantially supported by the record. Moreover, the ALJ properly considered this factor in discounting Dr. Flurry's opinions. *See* Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (citing Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (lack of any significant restrictions imposed by treating physicians supported the ALJ's decision of no disability)); *see also* Singleton v. Astrue, 542 F. Supp. 2d 367, 378–79 (D. Del. 2008) (in evaluating a plaintiff's credibility, ALJ did not err in considering, among other factors, that "none of [p]laintiff's treating physicians identified any specific functional limitations arising from her fibromyalgia or other conditions that would render her totally disabled").

Similarly, the ALJ noted that Dr. Flurry's treatment notes contain no complaints by Plaintiff regarding the side effects of her medications, yet Dr. Flurry testified at his deposition, essentially, that Plaintiff suffers from debilitating or disabling side effects (Tr. 627). Indeed, as the ALJ noted, it "is reasonable to assume that an individual who had experienced side effects to the extent [Dr. Flurry] alleged would have relayed these [to him] at an examination," and Dr. Flurry would have noted the complaints or changed Plaintiff's medications, or both (Tr. 627), but Dr. Flurry's treatment notes contain no such complaints. *See* Swindle v. Sullivan, 914 F.2d 222, 226 (11th Cir. 1990) (when a claimant has not complained of medication side effects, and the record contains no complaints of side effects to treating physicians, there is substantial evidence to support a finding that side effects are not a significant problem).

With regard to inconsistencies between the record as a whole and Dr. Flurry's testimony, the ALJ stated that objective medical evidence fails to substantiate Dr. Flurry's conclusions (*see* Tr. 627).[16] Specifically, the ALJ noted that studies and tests conducted during the relevant time frame

---

[16] The ALJ also noted that Dr. Flurry's conclusions and treatment appear to be based on Plaintiff's subjective complaints, which—as discussed *infra*—the ALJ found to be less than fully credible (*see* Tr. 627).

reveal that Plaintiff had mild osteoporosis, no significant abnormalities of the liver (other than a diffuse fatty liver), and features of ischemia in the colon (*id.*). In support, the ALJ referenced the following diagnostic testing:

> A pelvic and transvaginal ultrasound resulted in a finding of two echogenic structures near the vaginal cuff/cervical region which are calcified. (Exhibit 12F at 29 [Tr. 288]). A colon biopsy dated November 22, 2002 shows reparative ulcerated mucosa with features of ischemia, (Exhibit 6F at 36 [Tr. 212]) and an endoscopic biopsy of sigmoid colon polyps showed hyperplastic polyps. (Exhibit 6F at 28 [Tr. 204]). A DEXA bone density study dated December 19, 2002 showed mild osteoporosis in the lumbar spine and osteopenia in the left femoral neck. (Exhibit 12F at 24 [Tr. 283]). Frontal and lateral chest x-rays dated January 6, 2003 show mild chronic changes but no acute process. (Exhibit 12F at 23 [Tr. 282]). A mesenteric angiogram dated January 22, 2003 revealed an area of decreased mucosal enhancement in the distal descending colon and sigmoid colon that could be a focal point of ischemia. (Exhibit 6F at 21 [Tr. 197]). An abdominal and pelvic CT on June 4, 2003 showed diffuse fatty infiltration of the liver and no other significant abnormality. (Exhibit 6F at 19 [Tr. 195]) An abdominal ultrasound showed a slightly echogenic liver suggesting fatty infiltration. (Exhibit 6F at 18 [Tr. 194]). A June 26, 2003 hepatobiliary scan was unremarkable. (Exhibit 12F at 21 [Tr. 280]). A small bowel series dated August 15, 2003 showed no significant abnormality. (Exhibit 6F at 17 [Tr. 193]). An air contrast barium enema dated August 29, 2003 showed no definite abnormality. (Exhibit 6F at 16 [Tr. 192]). Frontal and lateral chest x-rays dated March 3, 2004 showed no acute process and a smooth round opacity described as most likely a 'benign fat pad.' (Exhibit 12F at 18 [Tr. 277]).

(Tr. 627 (referencing Tr. 396)). Thus, as the ALJ found, the foregoing objective medical evidence does not support the disabling restrictions imposed by Dr. Flurry.[17]

Similarly, the ALJ noted that Plaintiff had been examined by Dr. Lucey and Dr. Koulisis, and those examinations revealed that Plaintiff maintained her range of motion in the lower back with no spasm, and she had only a slight limitation as to flexion in her knee (Tr. 627). Moreover, as detailed *supra*, those examinations further revealed that Plaintiff's posture was normal, she was able to walk and had a normal gait, she had full range of movement of all major joints in her upper and

---

[17] The ALJ also considered that Dr. Flurry, a family practitioner, "questioned" the objective medical findings (Tr. 627), a consideration supported by the record. For example, during his testimony Dr. Flurry questioned the opinion of Dr. Cartee, a gastroenterologist, that Plaintiff did not suffer from ischemic bowel syndrome, an opinion Dr. Cartee formed after conducting diagnostic testing (e.g., a bowel angiogram) or reviewing the results thereof, or both (*see* Tr. 321). Dr. Powell, also a gastroenterologist, likewise opined that ongoing ischemic problems were "unlikely" (*see* Tr. 311).

lower extremities, and she had only a mildly decreased range of motion in her neck and thoracolumbar spine (Tr. 232). Furthermore, Dr. Koulisis specifically noted that although Plaintiff complained of low back pain, she "objectively" maintained her range of motion, had no palpable spasm, and was neurologically intact, and he opined—with regard to Plaintiff's orthopedic condition—that she had no physical limitations (*see* Tr. 356, 360–63).[18] Lastly, the ALJ noted Dr. Vernali's finding that Plaintiff had no limitations in range of motion (Tr. 627). Thus, in summary, the ALJ's finding that Dr. Flurry's opinions are not supported by the objective medical evidence (including the results of diagnostic tests and physical examinations) is substantially supported by the record, and the ALJ properly considered this factor in evaluating the opinions of Dr. Flurry. *See, e.g.,* 20 C.F.R. § 404.1529(c) (although not determinative of a claimant's credibility alone, an ALJ is permitted to consider the objective medical signs and laboratory findings, or lack thereof, when determining a claimant's credibility).

The ALJ additionally noted and considered that Dr. Flurry's opinions were inconsistent with the opinions of four other physicians—Dr. Peele, Dr. Neal, Dr. Lucey, and Dr. Koulisis—all of whom opined that Plaintiff was capable of performing work at a light level of exertion (Tr. 626). The ALJ did not err in considering that these four physicians, two of whom examined Plaintiff, reached opinions consistent with each other but inconsistent with the opinions of Dr. Flurry. Likewise, the ALJ did not err in finding that Dr. Flurry's opinion that Plaintiff "is not capable of working" (*see, e.g.*, Tr. 519), need not be accepted as true because the determination as to whether Plaintiff is disabled is one reserved to the Commissioner (Tr. 627).

In further considering Dr. Flurry's opinions, the ALJ articulated two additional reasons for discounting his opinions, one of which is only partially supported by the record and the other of which is not supported by the record.[19] First, the ALJ noted that Plaintiff's own reports of her

---

[18] Plaintiff states it is "mind boggling" that the ALJ accepted the opinions of Dr. Koulisis that Plaintiff, "a women with undisputed COPD," had no physical limitations (Doc. 19 at 14). Dr. Koulisis, however, specifically indicated that his opinions concerned only Plaintiff's orthopedic condition; the ALJ did not fully adopt Dr. Koulisis's opinions, as Plaintiff's RFC determination is far more restrictive; and the ALJ did not err in considering that, despite Plaintiff's complaints about orthopedic problems, such as back pain, her physical examination revealed no orthopedic limitations. This court does not find "mind boggling."

[19] As explained more fully *infra*, however, the ALJ's error in this regard does not entitle Plaintiff to relief.

mental and physical daily activities are greater than those assessed by Dr. Flurry (*id.*). In support, the ALJ pointed to Plaintiff's testimony during her first hearing (held August 23, 2004, which was during the time frame relevant to her claim) that she was able to take care of her personal needs without assistance, perform housework, cook, shop for groceries, and handle the household finances, which is inconsistent with disabling physical limitations (*see id.*). Plaintiff contends, however, that the ALJ mischaracterized her testimony and, therefore, erred in relying on this factor to discount the opinions of Dr. Flurry (Doc. 19 at 11–12).

In concluding that this finding is only partially supported by the record, the undersigned has reviewed Plaintiff's August 2004 testimony and notes, in relevant part, the following statements she made concerning her daily activities and physical capabilities: 1) she does "little things" around the house at her convenience, such as making beds or washing dishes, but washing dishes bothers her back so she has to take a break, sit, and then resume washing dishes; 2) she can "do things around the house" for up to fifteen to twenty minutes, stand for about twenty minutes, sit for twenty to twenty-five minutes, and on a "good day" can walk about a half of a block; and 3) she cannot do "a lot of" lifting, pulling, bending, or stooping because those activities cause back pain (Tr. 568–70, 574–75). Moreover, in response to specific questions by Plaintiff's attorney concerning what she does on a typical day and whether she cooks meals, Plaintiff answered as follows:

> Take my medicine, stay in my bathroom, make my bed, wash a few dishes, watch television a little bit, sleep, rest, etc. That's basically it. Sometimes I might wash a load of clothes but that's nothing just put them in the washing machine and let them go, put them in the dryer, take them out. . . . I don't cook like I used to. Everything I buy now I just throw it in the microwave and heat, fix it.

(Tr. 578–79). Additionally, in response to questions posed by the ALJ, Plaintiff testified that she was living in a house with her husband, twenty-five year old son, and dog; that she did not have a maid or housekeeper; and that she did all of the housework herself but did it "taking her time" (Tr. 586). Plaintiff also testified that "as long as [she] take[s] her time," she is able to take care of all of her personal needs such as feeding, bathing, and dressing herself; she also grocery shops to the extent that "she just go[es] in, get[s] what she need[s], and come[s] back out" (Tr. 586). Lastly, Plaintiff testified that she handles the family's "checkbook" and pays the bills (Tr. 586–87).

Based on the foregoing summary, the undersigned concludes that ALJ did not err in finding that in August 2004 Plaintiff was able to take care of her personal needs without assistance, perform housework, cook, shop for groceries, and handle the household finances, because the finding is supported by Plaintiff's testimony. Although Plaintiff testified that she had to perform some of these activities intermittently, or that she performed some of these activities at lesser levels than before, she nevertheless clearly indicated that she had the physical capacity to take care of herself and her household without assistance. However, the ALJ's related finding that Plaintiff's own reports of her mental and physical daily activities <u>are greater than</u> those assessed by Dr. Flurry (*see* Tr. 627) is not supported by the record. In relevant part, Dr. Flurry testified at his March 2004 deposition that Plaintiff could walk a city bock without rest, sit continuously for thirty to forty-five minutes, and stand for thirty to forty-five minutes (Tr. 328–29). Thus, Plaintiff's description of her abilities is generally more <u>restrictive</u> than Dr. Flurry's assessment of her abilities. While this may be a reason to question Plaintiff's credibility, given that Dr. Flurry believes she is capable of greater physical exertion than she asserts, or it may demonstrate a discrepancy between Plaintiff's opinions and those of her treating physician, or both, it does not support the ALJ's finding that Plaintiff's reports as to her abilities are greater than those assessed by Dr. Flurry. And to this extent the ALJ's finding is not supported by the record.

Second, in discounting Dr. Flurry's opinions, the ALJ stated that Dr. Flurry testified that he had not pushed Plaintiff to quit smoking because smoking actually helped her inflammatory bowel disease, but his treatment notes contradict this testimony because they reflect discussions with Plaintiff regarding smoking cessation (Tr. 627). The ALJ also stated that Dr. Flurry knew Plaintiff had COPD, so his testimony that he did not push Plaintiff to stop smoking, as he "probably should have," is not credible (*id.*). The record indeed reflects that Dr. Flurry encouraged Plaintiff to quit smoking. For example, on February 2, 2000, the day Plaintiff first presented to Dr. Flurry, she reported smoking one and a half packs of cigarettes for the past twenty-nine years, and she was "[c]ounseled [] to stop smoking" (Tr. 275). She was similarly counseled on at least three other occasions (Tr. 272, 270A), and on at least one occasion she was prescribed medication by Dr. Flurry to help her quit smoking (Tr. 268). However, contrary to the ALJ's characterization of Dr. Flurry's testimony, Dr. Flurry did not testify that he never advised Plaintiff to stop smoking. Rather, he

testified that he did not push Plaintiff to stop smoking "as much as [he] probably should have" (*see* Tr. 505) (emphasis added). Therefore, Dr. Flurry's discussions with Plaintiff about smoking cessation are not inconsistent with the actual testimony of Dr. Flurry that he should have, on a more frequent basis, urged Plaintiff to stop smoking. Thus, the ALJ's reasoning—while sound—was based upon a misinterpretation of Dr. Flurry's testimony and, therefore, this finding of the ALJ is not supported by the record.

In summary, the undersigned has concluded that the majority of the ALJ's reasons for discounting Dr. Flurry's opinions are substantially supported by the record, but two of the ALJ's reasons are not. The question thus becomes whether the reasons with substantial support in the record—standing alone—are sufficient to uphold the ALJ's decision below. The undersigned is persuaded that they are.

The undersigned has considered, first, that the ALJ applied the correct legal standard in considering the opinions of Dr. Flurry, and second, that the ALJ articulated many reasons for discrediting his opinions. Although careful review of the record reveals that two of the ALJ's reasons are not substantially supported by the record, the remaining reasons are well supported by the record and compelling. In short, those findings with substantial support in the record are more than sufficient to conclude that the ALJ's ultimate determination regarding Dr. Flurry is supported by substantial evidence from the record as whole. And as this court is well aware, review of the Commissioner's final decision at this level is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes, 936 F.2d at 1218 (11th Cir. 1991). Here it clearly was, and Plaintiff is therefore not entitled to relief on this claim.

A final point, though, must be considered. As with Dr. Vernali, Plaintiff suggests that the ALJ failed to follow the remand order of the Appeals Council with regard to Dr. Flurry. The remand order, in relevant part, states that the first decision of the ALJ failed to adequately consider Plaintiff's medications, including the side effects of those medications (Tr. 426). Moreover, as previously noted, the remand order also states that, if appropriate, the ALJ may request additional evidence or further clarification of the opinions (Tr. 427). Lastly, the remand order generally states that ALJ should consider the opinions of the treating and examining source opinions and explain the

weight given to the opinions (*id.*). The undersigned finds, as with respect to Dr. Vernali, that the ALJ complied with the directives of the remand order.

As instructed, the ALJ considered the opinions of Dr. Flurry, including (as discussed *supra*) the opinions he offered regarding the side effects of Plaintiff's medications, and the ALJ explained the weight he gave to the opinions. The ALJ did not request additional evidence or clarification concerning Dr. Flurry's opinions, but he was not required to do so by the terms of the remand order; rather, he was permitted to do so if appropriate. The record, however, is replete with information from Dr. Flurry, including his deposition testimony and years of his treatment records. The ALJ, therefore, had no need to solicit additional information from Dr. Flurry, and the ALJ did not err in failing to do so.

C.      Evaluation of Plaintiff's Credibility

Plaintiff contends the ALJ erred in finding her less than fully credible (Doc. 19 at 16–19). In support, Plaintiff asserts that the ALJ articulated only one reason for rejecting her complaints (that is, that her "allegations as to disabling symptoms relating to her shortness of breath" are not credible in light of her continued smoking, and it is "reasonable to assume" that an individual experiencing debilitating symptoms would not exacerbate her condition by continuing to smoke (*id.*; Tr. 628)), and the lone reason cited by the ALJ is insufficient to uphold his overall credibility finding (Doc. 19 at 18–19).

As this court is well aware, pain and other subjective complaints are treated by the Regulations as symptoms of disability. Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, "unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms." The Eleventh Circuit has articulated a three-part pain standard, sometimes referred to as the <u>Hand</u> test, as follows:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

Hand v. Heckler, 761 F.2d 1545, 1548 (11th Cir. 1986) (originally adopting the three-part pain standard). The Eleventh Circuit continues to follow the Hand test. Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Ogranaja v. Commissioner of Social Security, 186 Fed. Appx. 848, 2006 WL 1526062, at *3 (11th Cir. June 5, 2006) (quoting Wilson); Elam, 921 F.2d at 1216.

Underlying the Hand standard is the need for a credibility determination concerning a plaintiff's complaints. Those complaints are, after all, subjective. "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain [or other symptom]." Scharlow v. Schweiker, 655 F.2d 645, 649 (5th Cir. Sept. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints"). People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed symptom]. This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts to ensure that the finding is supported by substantial evidence." Hand, 761 F.2d at 1548–49. It is within the ALJ's "realm of judging" to determine whether "the quantum of [symptoms a claimant] allege[s] [is] credible when considered in the light of other evidence." Arnold v. Heckler, 732 F.2d 881, 884 (11th Cir. 1984). The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief or the plaintiff's claims, is the basis for the ALJ's credibility determination.

In the instant case, while the ALJ could have better articulated his findings, it is evident that he intended to use the same reasons he discredited Dr. Flurry's opinions as reasons for finding Plaintiff less than fully credible. The ALJ, therefore, did not discredit Plaintiff's complaints based only on one reason (that is, her continued smoking). In reaching this conclusion, the undersigned notes, initially, that the discussion of Dr. Flurry's opinions and Plaintiff's credibility are contained in the same section of the ALJ's decision, a section that begins with the ALJ's statement that he has considered Plaintiff's symptoms "based on the requirements of 20 C.F.R. [§] 404.1529," and a section that ends with his conclusion that Plaintiff's complaints are not entirely credible (*see* Tr.

625–28). Moreover, within that discussion (specifically, in discounting Dr. Flurry's opinions), the ALJ stated that Dr. Flurry "appeared to treat [Plaintiff's] subjective complaints" (Tr. 627). In making this statement, it is clear that the ALJ was noting that although Dr. Flurry appeared to believe Plaintiff's complaints, other evidence in the record was inconsistent with or did not support those complaints (or Dr. Flurry's opinions/treatment based on the complaints) (*see id.*). The ALJ then identified evidence in the record that called into question both Dr. Flurry's opinions and Plaintiff's complaints. For example, in discussing the lack of objective medical evidence supporting Dr. Flurry's opinions, the ALJ specifically stated that he found it "significant that on two [consultative] examinations, despite [Plaintiff's] complaints, she objectively maintained her range of motion in her lower back with no spasm, and only had a slight limitation as to flexion of her knee" (*id.*) (emphasis added). The ALJ also noted that Dr. Flurry credited Plaintiff's subjective complaints to the extent he actually "questioned" the results of objective tests and the opinions of specialists who reviewed those tests (*see id.*). The ALJ also considered Plaintiff's daily activities, a factor normally considered in weighing a claimant's credibility (and, indeed, a factor mentioned by the ALJ as one he could consider in that context) (*see* Tr. 625), and he found that Plaintiff was able to take care of her personal needs without assistance, perform housework, cook, shop for groceries, and handle household finances (Tr. 627).[20] Furthermore, immediately following the ALJ's evaluation of Dr. Flurry's opinions, the ALJ added that Plaintiff's complaints as to shortness of breath are belied by her continued smoking—a factor that relates only to Plaintiff's credibility (as does her failure to follow Dr. Flurry's recommendation that she quit smoking),[21] not the credibleness

---

[20] As previously discussed, this finding of the ALJ is substantially supported by the record. Moreover, it is a factor that may be considered in evaluating Plaintiff's credibility. Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005); *see also* Graham, 129 F.3d at 1422 (affirming ALJ's determination that claims of work impairment could not be squared with claimant's ability to care for herself and manage daily activities of childcare and housework). Although Plaintiff's descriptions of her activities show some limitations, the ALJ is not required to believe all of her assertions concerning those activities. *See* Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996).

[21] *See* Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (refusal to follow prescribed medical treatment without a good reason will preclude a finding of disability); *see also* Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003) ("[T]he ALJ's consideration of Ellison's noncompliance as a factor in discrediting Ellison's allegations of disability is adequately supported . . . ."). Some courts, however, have found that failure to quit smoking against medical advice may not be a proper factor to consider in evaluating a claimant's credibility. *See, e.g.*, Seals v. Barnhart, 308 F. Supp. 2d 1241, 1251–52 (N.D. Ala. 2004) ("mere failure to stop smoking, . . . , does not constitute a refusal to undertake a prescribed course of treatment"; the ALJ must make a finding that failing to smoke would restore the claimant's ability

of Dr. Flurry's opinions (Tr. 627–28). The ALJ then concluded the discussion (and the aforementioned section of his decision) by stating, "After considering the evidence of record, the undersigned [ALJ] finds that [Plaintiff's] medically determinable impairments could reasonably be expected to produce the alleged symptoms but that [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 628).

Thus, when the ALJ's decision is read as a whole, it is evident that the ALJ did not cite only one reason for finding Plaintiff less than fully credible. Rather, the ALJ simultaneously considered Dr. Flurry's opinions and Plaintiff's credibility; he then articulated an additional reason for discrediting a specific complaint made by Plaintiff (that is, her shortness of breath). "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court [as it is here]. The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted). Moreover, having already concluded that the ALJ's findings as to Dr. Flurry are substantially supported by the record, the undersigned likewise concludes that his findings as to Plaintiff's credibility are similarly supported. See Jones v. Dep't of Health and Human Serv's, 941 F.2d 1529, 1532 (11th Cir. 1991) (the reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence). Accordingly, Plaintiff is not entitled to relief on this claim.

D.    Determination of Plaintiff's Residual Functional Capacity

Plaintiff contends the ALJ erred in determining her RFC and making related findings at step four (that is, that Plaintiff could return to her past relevant work ("PRW") as a cashier at a golf

---

to work); *but see* King v. Astrue, Case No. 5:07cv84/RS/EMT, 2008 WL 2038245, at *10 (N.D. Fla. March 12, 2008) (failure to quit smoking properly considered where record revealed reduced smoking improved claimant's condition, noting ALJ's observation that continued smoking "begs the question of how serious [claimant's] symptoms are"); Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (ALJ properly considered that claimant did not choose to forgo smoking three packs of cigarettes a day to help finance pain medication). It appears that the ALJ properly considered this factor here, as smoking cessation undoubtedly would improve Plaintiff's COPD, shortness of breath, and stamina, but even if the ALJ erred in considering this factor, the error is harmless, as Plaintiff's continued smoking was but one of many factors considered by the ALJ in evaluating her credibility.

course and as a retail manager because that work does not require the performance of work-related activities precluded by Plaintiff's RFC) (Doc. 19 at 5–9). In support, Plaintiff essentially makes two arguments. Plaintiff first contends that although the ALJ relied upon the testimony of a VE, the ALJ erroneously failed to incorporate Plaintiff's pain into the hypothetical questions he posed to the VE and failed to include Plaintiff's pain in the RFC (*id.* at 6–7). Second, Plaintiff contends that, although the ALJ included restrictions with regard to humidity and temperature extremes in her RFC, "he failed to quantify" these limitations, and his failure to do so is a "fatal flaw" because Plaintiff's PRW on a golf course operating a beverage cart necessarily exposes her to both humidity and temperature extremes (*id.* at 7). Having already determined that the ALJ properly discounted Plaintiff's complaints of disabling pain and other symptoms, the undersigned addresses only Plaintiff's second contention.

At step four the ALJ must assess the claimant's RFC. 20 C.F.R. § 404.1520(a)(4)(iv). RFC is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite limitations. 20 C.F.R. § 404.1545(a); *see also* Lewis, 125 F.3d at1440. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Although the RFC determination is a medical question, it is not based only on "medical" evidence, that is, evidence from medical reports or sources; rather, an ALJ has the duty, at step four, to assess RFC on the basis of all the relevant, credible evidence of record. *See* Phillips, 357 F.3d at1238; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations); Dykes v. Apfel, 223 F.3d 865, 866–67 (8th Cir. 2000) (per curiam) (RFC is a determination based upon all the record evidence, but the record must include some medical evidence that supports the RFC finding). *See also* 20 C.F.R. § 404.1545; SSR 96-8p, available at 1996 WL 374184 (S.S.A. 1996).

Moreover, an ALJ may rely on a claimant's own description of the duties involved in her PRW. Santiago v. Sec'y of Health & Human Servs., 944 F.2d 1, 5 (1st Cir. 1991). Thus, vocational expert testimony is not required to establish that a claimant can return to her PRW as long as other substantial evidence supports the ALJ's conclusion. Molina v. Barnhart, No. Civ. A. 03-CV-2039,

2004 WL 2250928, at *5 (E.D. Pa. Sept. 30, 2004) (citing Rivera v. Barnhart, 239 F. Supp. 2d 413, 420–21 (E.D. De. 2002)). *See also* Lewis v. Barnhart, No. 05-3-B-W, 2005 WL 1923514, at *2 (D. Me. Aug. 9, 2005) ("The case law makes clear that vocational testimony is not required at Step 4.") (citations omitted).

In the instant case, Plaintiff twice appeared before the ALJ for hearings, and the same VE was present at each hearing. At her first hearing, Plaintiff was asked by the ALJ if her work history report was accurate, and Plaintiff confirmed that it was (Tr. 562 (referencing Tr. 136)). The work history report reflects, in relevant part, that Plaintiff's PRW at a golf course was at AC Read Golf Course at Pensacola Naval Air Station, and Plaintiff worked there from approximately 1990 through 2000; her past relevant work as a retail manager was at Contractors Industrial Choice, and Plaintiff worked there in 1993 and 1994 (Tr. 136).[22] Plaintiff described her golf course position as a "Cashier Checker," which entailed driving a beverage cart and making cash reports and deposits; she described her managerial position as involving filling orders, stocking, making case reports and deposits, and "shipping and receiving" (*id.*). Plaintiff was then asked if she was able to return to her PRW at the golf course, and Plaintiff stated that she was no longer able to perform that work, explaining as follows:

> I can't stand the heat. I couldn't do the lifting. The lifting part wasn't that bad during the day but it was unloading and loading the cart you did quite a bit of lifting. Lifting the sodas and the beer and the drinks out of it and, and you had a big old crate like thing you had to put them and count them and all. So, no, I couldn't [perform that job].

(Tr. 579). Similarly, in response the same question at Plaintiff's second hearing, Plaintiff testified as follows:

> Oh, no. The heat, the cold bothers me, bothers my breathing. I can't concentrate like I used to and, you know, doing that job you had to be able to concentrate because you got golf balls flying at you. Plus that cart is not a smooth ride it's just constantly bouncing up and down. I don't think I could stand it on my back and stomach. I don't think I can deal with the people out there.

---

[22] The work history report also reflects past work in 2001 as a cashier and order-taker at Smokies Barbeque, a job Plaintiff quit because—as she specifically testified—she did not like the job, not because she was asked to quit or was unable to perform the job (*see* Tr. 133, 136, 561–62).

(Tr. 604–05).

Likewise, Plaintiff was asked at both hearings if she could return to her PRW as a retail manager, and her response on both occasions was that she was not able to perform that work either. Specifically, at the first hearing Plaintiff stated, "I couldn't concentrate enough to do that job. You had to really concentrate on that job and I couldn't keep my mind on it not the way I feel and everything. And I, I couldn't do the lifting that I had to do there." (Tr. 579). Similarly, at Plaintiff's second hearing, she stated she could not perform the managerial work because she could not "concentrate on learning the new technology" and could not "do the lifting like I did way back then," noting that "[t]here's a lot of lifting in that job and a lot of learning" (Tr. 605).

After considering Plaintiff's testimony and the exhibits in the file, the VE testified at Plaintiff's first hearing and characterized Plaintiff's past work at the golf course (as she performed the work) as work most likely performed at a light level of exertion, and her past work at Contractor's Industrial as work most likely performed at a light or medium level of exertion (Tr. 587–88). The ALJ then asked the VE to assume a hypothetical individual of Plaintiff's age, education, and past work history, who had the physical capacities and limitations set forth by Dr. Koulisis, and he then asked whether the individual could return to Plaintiff's PRW (Tr. 590). The VE responded in the affirmative (*id.*). Next, the ALJ asked the VE to assume the same hypothetical individual, but he additionally asked the VE to consider the opinions of Dr. Peele and Dr. Neal (Tr. 590). The VE again opined that Plaintiff could return to her PRW (*id.*). The ALJ then asked the VE to consider the opinions of Dr. Vernali, as follows (*see* Tr. 590–91):[23]

> If we assume [that Dr. Vernali's opinions on the physical capacities evaluation form ("PCE") are] a fair assessment of her ability to do basic work activities and that her testimony is fully credible as to her age, education, and past work could she do her past work if I modify the PCE to show that—I don't know what's going on with the form because that's an hour stand in an eight hour workday but a total at one time of one to two hours. Now assume that I find the figures on the right [side of the PCE form are accurate; that is,] that she can sit one to two hours at a time, stand one to two hours at a time, and walk one hour. [But, assume that I find the figures on the left are inaccurate (that is, that in an eight-hour workday Plaintiff can sit or stand for

---

[23] The transcript reflects "Dr. Ranalie [phonetic]" (Tr. 590–1) (brackets in original), but is evident that the ALJ is referring to Dr. Vernali.

one or less than one hour a day, total), and instead I find] that she can during an eight hour work[day] sit six hours and [] stand and walk three hours each.[24]  With that modification could she do her past work?

(Tr. 591).

The VE responded that as long as Plaintiff was not required to lift more than twenty pounds she could return to her PRW, but if the lifting went "beyond the light level," she would not be able to return to her PRW (*id.*).  On cross-examination the VE testified that Dr. Vernali's limiting Plaintiff to only occasional stooping, crouching, kneeling, crawling, pushing or pulling "reduces the exertional level of light to less than light" (Tr. 594).  At Plaintiff's second hearing the VE was asked if her opinions remained the same, and she responded that they remained the same (Tr. 613).

       Thus, the VE was present at each hearing and heard Plaintiff testify about the demands of her PRW, as well as her belief that she could not return to the golf course job, in part, because of the heat or cold, or both.  Notwithstanding, the VE opined that Plaintiff could return to that job (assuming that certain opinions, as described *supra*, were accepted as true).  Moreover, the VE distinguished Plaintiff's past work from similar work described in the Dictionary of Occupational Titles ("DOT") and based her opinions on Plaintiff's past work as Plaintiff actually performed it, evidencing the VE's awareness of the particular requirements of Plaintiff's past work (*see* Tr. 587–88).  Relying on this testimony of the VE the ALJ found that Plaintiff could return to her PRW on the golf course.  And, if an individual can perform her past relevant work, either as she performed it, or as the work is performed in the national economy, she is not disabled.  *See* Jones v. Chater, 86 F.3d 823, 825 (8th Cir. 1996); Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir. 1996); *see also* SSR 82-61, available at 1982 WL 31387 (S.S.A. 1982).  However, as Plaintiff points out, the ALJ included in Plaintiff's RFC "limitations as to her ability to work . . . in humidity or temperature extremes," limitations that—despite the VE's testimony—are seemingly inconsistent with a finding that Plaintiff could work outdoors in the summer in the panhandle of Florida.

       However, if the ALJ erred in relying on the VE's testimony and finding that Plaintiff could return to her PRW work on the golf course, the undersigned concludes that for two reasons the error

---

[24] The court notes that the ALJ's modification is consistent with or <u>less</u> restrictive than the opinions of Dr. Peele, Dr. Neal, and Dr. Koulisis.

is harmless. First, if an individual can perform her past relevant work, either as she performed it, or as the work is performed in the national economy, she is not disabled. SSR 82-61; <u>Jones v. Chater</u>, 86 F.3d at 825. Here, the VE testified that Plaintiff's "golf course position, according to the DOT, falls more likely in the category of receptionist which is classified as <u>sedentary</u> and semi-skilled" (Tr. 587–88) (emphasis added). Thus, even if Plaintiff could not perform her past work as she actually performed it due to temperature extremes or humidity, she could likely perform the job of receptionist as it is generally performed, that is, at a sedentary level of exertion, which not only is less strenuous than work performed at the light exertional level but also would likely not expose Plaintiff to temperature extremes or humidity. *See* 20 C.F.R. § 404.1567(b) ("If someone can do light work [as the ALJ found here], we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time"). Second, the ALJ found that Plaintiff was also capable of performing her PRW as a manager, a finding that is well supported by the evidence and opinions in the record (or, more specifically, the evidence and opinions in the record that were properly found credible by the ALJ, as discussed *supra*). Thus, because Plaintiff can return to the managerial work, it matters not that the ALJ may have erred in finding Plaintiff could perform her PRW on the golf course. *See, e.g.*, <u>Diorio v. Heckler</u>, 721 F.2d 726, 728 (11th Cir. 1983) (the ALJ's decision will stand when an incorrect application of the regulations results in "harmless error," because the correct application would not contradict the ALJ's ultimate findings); <u>Brueggemann v. Barnhart</u>, 348 F.3d 689, 695 (8th Cir. 2003) (the harmless error inquiry involves determining "whether the ALJ would have reached the same decision denying benefits, even if he had followed the proper procedure . . . .").

Moreover, regarding the managerial position, it is worth noting that Plaintiff does not allege specific error with regard to this finding (except to the extent it is based on the ALJ's discounting of Plaintiff's testimony or the opinions of Dr. Flurry and Dr. Vernali), and the undersigned finds no error (in light of the other findings in this Report). Although Plaintiff testified that she could not return to her work as a manager because the job required concentration and lifting abilities beyond her capacities, the ALJ included no concentration limitations in Plaintiff's RFC (and Plaintiff does not allege, nor has the court found, error in this regard). As to lifting, the VE testified that Plaintiff

could perform the job as long as it did not exceed the requirements of light work, which involves lifting or carrying up to twenty pounds.  It is clear, though, that Plaintiff's PRW as a manager did not require lifting greater than twenty pounds.   On a work history report Plaintiff specifically indicated that her managerial work required frequent lifting of "less than 10 pounds" and that the heaviest weight she ever lifted was twenty pounds (Tr. 102, 105, 107).  Likewise, to the extent Dr. Vernali's limiting Plaintiff to only occasional stooping, crouching, kneeling, crawling, pushing or pulling "reduces the exertional level of light to less than light," the court notes that Plaintiff described the managerial job on a work history report as involving no climbing, stooping, kneeling, crouching, crawling, reaching, or handling, grabbing, and  grasping big objects (Tr. 102, 105).[25] Thus, the exertional level of the job as Plaintiff performed it is compatible with Dr. Vernali's opinions (except the previously-discussed opinions of his that were properly rejected by the ALJ), as well as the opinions of Dr. Koulisis, Dr. Lucey, Dr. Peele, and Dr. Neal.  And, although the VE's testimony was not required at step four, *see* Lucas v. Sullivan, 918 F.2d 1567, 1573 n.2 (11th Cir. 1990); *but see* SSR 82-61 (recognizing that a VE may be appropriate at step four), her testimony in this case provides additional evidence in support of the ALJ's findings.  Thus, substantial evidence, including the VE's testimony, supports the ALJ's decision that Plaintiff can return to her PRW as a manger, and any error—to the extent it exists—with regard to the ALJ's finding that Plaintiff can return to her PRW on the golf course is harmless.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 18ᵗʰ day of February 2010.

---

[25] On another report Plaintiff described the job requirements in the same manner, except she indicated that job required one hour of stooping per day (Tr. 102, 107).  One hour in an eight-hour day, though, does not even rise to level of "occasional," as "occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about two hours of an eight-hour workday.  *See* SSR 96-9p, available at 1996 WL 374185, at *3 (1996).

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).